UNITED STATES DISTRICT COURT

FOR THE MIDDLE DISTRICT OF LOUISIANA

| | |
|---|---|
| SADIE BENNETT and MELISSA MANNINO, Individually and on Behalf of All Others Similarly Situated, | Case No. |
| Plaintiffs, | |
| vs. | |
| LOUISIANA HEALTH SERVICE & INDEMNITY COMPANY (doing business as BLUE CROSS AND BLUE SHIELD OF LOUISIANA) | |
| Defendant. | |

**COMPLAINT-CLASS ACTION**

## CONTENTS

Introduction .................................................................................. 1

Jurisdiction ................................................................................... 7

Parties and Non-Parties ............................................................... 8

Substantive Allegations ............................................................... 9

    Health plans in the United States .................................. 9

    The pharmacy benefits industry .................................... 9

    The relevant contractual relationships ........................ 11

    Plaintiffs' Plan ............................................................ 13

    BCBS's Plans have standard terms .............................. 16

    Plaintiffs' purchases ................................................... 16

Administrative remedies inapplicable or  deemed exhausted ................. 19

    The Plan's administrative remedies are inapplicable
    to overcharges ............................................................ 19

    Plaintiffs appealed ...................................................... 20

BCBS participants pay undisclosed, unauthorized and
excessive prescription drug cost shares ................................... 20

Defendant is a fiduciary and party in interest ......................... 24

Defendant's ERISA duties .......................................................... 28

Defendant breached its fiduciary duties .................................... 31

Class Action Allegations ............................................................ 33

The Statute of Limitations Should Be Tolled ........................... 36

Counts ......................................................................................... 37

    Count I ......................................................................... 37

    Count II ........................................................................ 39

    Count III ....................................................................... 41

    Count IV ....................................................................... 44

Prayer for Relief ......................................................................... 47

Sadie Bennett and Melissa Mannino ("Plaintiffs") allege the following against Louisiana Health Service and Indemnity Company (doing business as Blue Cross and Blue Shield of Louisiana) ("BCBS"), based upon their knowledge, the investigation of Plaintiffs' counsel, and upon information and belief. Plaintiffs believe that substantial additional evidentiary support exists for the allegations set forth herein after a reasonable opportunity for discovery.

## INTRODUCTION

2.      Plaintiffs, participants who received prescription drug benefits through a group health plan insured and administered by BCBS (the "Plan"),[1] bring this action on behalf of themselves and a Class of similarly situated persons alleging violations of the Employee Retirement Income Security Act of 1974 ("ERISA") (codified at 29 U.S.C. § 1001 *et seq*.), resulting from Defendant's violation of the Plans by inflating prescription drugs costs, thereby causing consumers to pay more than they otherwise should have paid for medically-necessary prescription drugs.

3.      About 90% of all United States citizens are now enrolled in private or public health plans that cover some, or all, of the costs of medical and prescription drug benefits. A feature of most of these plans is the shared cost of prescription drugs. Normally, when a patient[2] fills a prescription for a medically-necessary prescription drug under his or her health care plan, the plan/insurer pays a portion of the cost and the patient pays the remaining portion of the cost directly to the pharmacy in the form of a copayment (often a set dollar amount), coinsurance

---

[1]     Unless otherwise specified, the term "Plans" as used herein includes both health plans that are funded by an employer but administered through "administrative-services-only" ("ASO") contracts between one or more Defendant and the plan, and health plans implemented through an insurance policy underwritten and issued by one or more Defendant to cover medical and prescription drug expenses incurred by the plan.

[2]     The term "patient" refers to a plan participant or beneficiary under a prescription drug Plan issued or administered by Defendant who purchases prescription drugs pursuant to that Plan.

(often a percentage of the cost) or deductible payment. Defendant directed the pharmacies to collect these cost-sharing payments on Defendant's behalf from patients at the time the prescription was filled.

4.     Defendant — as administrator of prescription drug benefits — provides and administers pharmacy benefits to patients, including, but not limited to, managing a network of pharmacies that will serve as participating pharmacies at which patients obtain prescriptions; setting and dictating copayment amounts, coinsurance amounts, and deductibles (if applicable) to pharmacies; and processing prescription drug claims and interfacing with patients and pharmacies regarding applicable prescription drug coverage.

5.     As set forth below, Defendant has overcharged patients for the cost of medically-necessary prescription drugs. Patients, including Plaintiffs and the Class (defined below), paid excessive charges to participating pharmacies for prescription drugs. The amounts that Plaintiffs should have paid for cost-shares for prescription drugs were set forth in the Plans and were based on, in part, the actual cost of the prescription drugs they purchased. Defendant directed the pharmacies to misrepresent the cost-sharing amounts for prescription drugs and charge Plaintiffs excessive amounts, and Defendant forced Plaintiffs and the Class to pay excessive cost-sharing amounts. This is not a matter of mistaken or innocently erroneous calculations: it is a pervasive scheme to overcharge Plaintiffs and everyone similarly situated in connection with their prescription drug purchases.

6.     With respect to prescription drugs received from in-network pharmacies, the Plans set limits on cost-share amounts based on the amount that the pharmacy agreed (with Defendant or its pharmacy benefits manager) to be paid for the respective prescription drug. Specifically, under the Plans, copayments and coinsurance and deductible amounts must be

based on the formula found in the Plans. Contrary to the express language of the Plans, Defendant exercised its unilateral discretion to require network pharmacies to charge Plaintiffs and the Class unauthorized and excessive cost-sharing amounts for prescription drugs violating the Plans' plain language ("Overcharges").

7.        Moreover, Defendant profited from its scheme by taking or "clawing back" some or all of these Overcharges by requiring the pharmacies to pay the Overcharges to Defendant after the pharmacies collected them from Plaintiffs and the Class ("Clawbacks") or by paying the pharmacies less than what Defendant would have, had it followed the Plans.

8.        As further detailed below, the express language of Plaintiffs' Plan administered and insured by BCBS promised that Plaintiffs' cost shares for prescription drugs purchased from network pharmacies would be based on the amounts negotiated between BCBS and the pharmacies.

9.        Defendant routinely and purposely violated this Plan provision. For example, on November 20, 2017, Defendant failed to follow the Plan language by unilaterally determining that Plaintiff Bennett had to pay a $123.96 cost share to a pharmacy to purchase a prescription drug and required the pharmacy to collect this amount from the patient. Unknown to Plaintiff, under her Plan, she should have paid only $121.12.  Specifically, because Defendant's contract with the pharmacy provided that the pharmacy would be paid $121.12 for the prescription, the cost share should have been *at most* $121.12. But, Defendant unilaterally directed and required the pharmacy to charge and collect the $123.96 copayment from Plaintiffs, thereby overcharging Plaintiff Bennett $2.84.

10.        Had Defendant lived up to its fiduciary, disclosure, and other legal obligations under the Plan, Plaintiff Bennett would not have paid more than the $121.12 amount set forth in

the Plan for this prescription drug. Defendant should have and easily could have exercised its unilateral discretion to comply with the terms of Plaintiffs' Plan and its fiduciary duties, and determined that the pharmacy should charge and collect from Plaintiff, at a maximum, only $121.12. Instead, Defendant exercised discretion to impose a mark-up beyond the amount set forth in the Plan and required the pharmacy to collect that amount from Plaintiff.

11.     Defendant violated the Plans and breached its ERISA fiduciary duties by exercising its discretion to secretly determine that patients must pay inflated copayments, coinsurance, and deductible payments and then directing pharmacies to collect those inflated copayments, coinsurance, and deductible payments on their behalf (which Overcharges were then either retained by the pharmacies, remitted to Defendant in the form of Clawbacks, or retained by Defendant because it didn't have to pay that amount to the pharmacy).

12.     Defendant misrepresented to Plaintiffs and the Class the cost-sharing amounts under the Plans and that their cost-sharing amounts were based on the amount that the pharmacy agreed to accept for the drugs, when, in fact, patients were charged and paid an amount based on inflated "costs." By engaging in this conduct, Defendant violated ERISA's fiduciary duties and engaged in prohibited transactions.

13.     Defendant's Overcharge scheme to artificially inflate the costs for medically-necessary prescription drugs by overcharging patients, and then to require pharmacies to collect Overcharges or to take Clawbacks is inconsistent with the purposes of the health care system. For one, patients are paying higher amounts than they otherwise would have paid had Defendant not artificially inflated the payment amounts. Patients are supposed to save money through the use of pharmacy benefits, but in reality, they are charged excessive amounts.

14.     Indeed, the very purpose of obtaining or participating in a health plan that includes pharmacy benefits is to enable patients to benefit from the administrator's negotiating and buying power with prescription drug manufacturers and pharmacies. This should result in *reduced* costs for prescription drugs. Patients also pay substantial premiums and other costs and fees, which should cover the other aspects of the prescription drug plans, including their administration. Moreover, administrators and insurers, such as Defendant, are paid significant fees and premiums as compensation for their services that are entirely separate from the Clawbacks at issue here, making the Clawbacks an excess, undisclosed profit in exchange for little to nothing. Accordingly, Plaintiffs should not have been charged additional secret Overcharges.

15.     As a result of Defendant's scheme to collect Overcharges, Defendant overcharged Plaintiffs and the other Class members for prescription drugs during the Class Period (defined below). Defendant's misconduct has caused Plaintiffs and the other Class members to suffer significant damages. Plaintiffs seek relief by bringing the following claims:

16.     With regard to ERISA, under Count I, ERISA § 502(a)(1)(B), 29 U.S.C. § 1132(a)(1)(B), provides that a participant or beneficiary may bring an action to enforce her rights under the terms of the plan or to clarify her rights to future benefits under the terms of the plan. Defendant has violated the ERISA Plans by instructing pharmacies to charge Overcharges and taking Clawbacks and it should not be allowed to continue to do so.

17.     Under Count II, ERISA § 406(a), 29 U.S.C. § 1106(a), provides that a party in interest shall not receive direct or indirect compensation unless it is reasonable and prohibits transfers of plan assets and use of plan assets by or for the benefit of fiduciaries and plan service providers. In setting the amount of and taking excessive undisclosed Overcharge compensation

and Clawbacks, Defendant allowed and received unreasonable compensation and misused the assets of the ERISA Plans, including Plan and employer contributions under coinsurance Plans and Plan contracts, that provided Defendant with the ability and discretion to extract these funds from patients.

18.    Under Count III, ERISA § 406(b), 29 U.S.C. § 1106(b), provides that a fiduciary shall not deal with plan assets in its own interest or for its own account, act in any transaction involving the plan on behalf of a party whose interests are adverse to participants or beneficiaries, or receive any consideration for its own personal account from any party dealing with such plan in connection with a transaction involving the assets of the plan. In exercising its control over Plan contracts, requiring pharmacies to assess Overcharges and remit Clawbacks to Defendant, and otherwise controlling Plan and employer contributions under coinsurance Plans, Defendant dealt with and received plan assets and consideration for its personal accounts and in its own interest, acted on behalf of parties whose interests are adverse to the interests of the Plans and participants, and received consideration for its own accounts from parties dealing with the Plans in transactions involving the assets of the Plans, in violation of this provision.

19.    Under Count IV, ERISA § 404(a)(1), 29 U.S.C. § 1104(a)(1), provides that a fiduciary shall discharge its duties with respect to a plan (1) solely in the interest of the participants and beneficiaries and for the exclusive purpose of providing benefits to participants and beneficiaries and defraying reasonable expenses of administering the plan, (2) with the care, skill, prudence and diligence under the circumstances then prevailing that a prudent person acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims, and (3) in accordance with Plan documents. By setting the

amount of and forcing the pharmacies to collect Overcharges and by taking Clawbacks, Defendant have breached these fiduciary duties.

20.    As further alleged below, Plaintiffs seek to represent a nationwide Class of all insureds and plan participants and beneficiaries whose health Plans are administered by Defendant.

## JURISDICTION

21.    **Subject Matter Jurisdiction.** This court has subject matter jurisdiction over this action pursuant to (1) 28 U.S.C. § 1331, which provides for federal jurisdiction over civil actions arising under the laws of the United States, including ERISA and (2) 29 U.S.C. § 1132(e)(1) providing for federal jurisdiction of actions brought under Title I of ERISA. Further, declaratory and injunctive relief are authorized by 28 U.S.C. §§ 2201 and 2202 and Rules 58 and 65 of the Federal Rules of Civil Procedure.

22.    **Personal Jurisdiction.** ERISA § 502(e)(2), 29 U.S.C. § 1132(e)(2) provides for nationwide service of process. Defendant is a resident of the United States and subject to service in the United States, and this Court therefore has personal jurisdiction over it. This Court also has personal jurisdiction over Defendant pursuant to Fed. R. Civ. P. 4(k)(1)(A) because it would be subject to the jurisdiction of a court of general jurisdiction in Louisiana. Defendant may be found in this District and conducts substantial business herein: Defendant is authorized to do business in the State of Louisiana; Defendant conducts business in the State of Louisiana and in this District; Defendant advertise sand promotes its services in the State of Louisiana and in this District; Defendant has sufficient minimum contacts with the State of Louisiana; Defendant administers and insures health plans and pharmacy benefits under those plans from the State of Louisiana; and/or Defendant otherwise intentionally avails itself of the markets in the State of Louisiana through the marketing and sale of health plans and related products and services in this

- 7 -

State so as to render the exercise of jurisdiction by this Court permissible under traditional notions of fair play and substantial justice.

23.    **Venue.** Venue is proper in this Court pursuant to 28 U.S.C. § 1391, because a substantial part of the events giving rise to the claims herein occurred within this District and/or a substantial part of property that is the subject of the action is situated in this District. Venue is also proper in this District pursuant to ERISA § 502(e)(2), 29 U.S.C. § 1132(e)(2), because Defendant may be found in this District and Plaintiffs' Plans are administered in this District.

## PARTIES AND NON-PARTIES

24.    Plaintiffs are both citizens of Louisiana. They each received prescription drug coverage through a health and welfare plan through their employer. The prescription drug benefits were administered by BCBS. This Plan is a welfare benefit plan subject to ERISA. Under the Plan, Plaintiffs were obligated to pay a cost share to purchase prescription drugs. As a result of Defendant's scheme, Plaintiffs have been injured by paying inflated amounts for medically-necessary, covered prescription drugs.

25.    Defendant BCBS is Louisiana's largest health insurer and a licensee of the Blue Cross and Blue Shield Association. It provides health insurance products and related services through offices across the state. According the Company's website, it services 1.8 million Louisianans. The Company offers HMO, PPO, supplemental Medicare, and traditional indemnity plans. In addition to medical coverage, BCBS sells group life and disability insurance through its Southern National Life Insurance Company subsidiary and also offers voluntary dental and accidental death and dismemberment coverage. The company was founded in 1934 and is headquartered in Baton Rouge, Louisiana with regional offices in Alexandria, Houma, Lafayette, Lake Charles, Monroe, New Orleans, and Shreveport.

## SUBSTANTIVE ALLEGATIONS

### Health plans in the United States

26.     Over 90% of health care beneficiaries in the United States have a health care plan (either private or public) that covers all, or a portion of, their medical and pharmaceutical expenses.

27.     Health insurance is paid for by a premium paid for medical and prescription drug benefits for a defined period; or through employer plans that either provide benefits by purchasing group insurance policies, or are self-funded but administered by health insurance companies and their affiliates. Premiums and contributions for coverage in all types of plans can be paid by individual plan participants or beneficiaries, employees, unions, employers or other institutions.

28.     If a Plan covers outpatient prescription drugs, the cost for prescription drugs is typically shared between the patient and the Plan. Such cost sharing can take the form of deductible payments, coinsurance payments, and copayments. In general, deductibles are the dollar amounts the patient pays during the benefit period (usually a year) before the Plan starts to make payments for drug costs. Coinsurance generally requires a patient to pay a stated percentage of drug costs. Copayments are generally fixed dollar payments made by a patient toward drug costs.

### The pharmacy benefits industry

29.     The pharmaceutical benefits industry consists of complex arrangements between numerous entities, including, but not limited to, drug manufacturers, drug wholesalers, PBMs, pharmacies, health insurance companies, employers, and health plan participants and beneficiaries.

30.     On the drug distribution side of the market, the drug manufacturer typically sells drugs to a drug wholesaler, which in turn sells the drugs to a retail pharmacy. Payments for the drugs in turn go from the retail pharmacy to the wholesaler and to the manufacturer. The retail pharmacy then distributes drugs to patients from its inventory. Neither the PBM nor the insurer/administrator is involved in the distribution of prescription drugs by the retail pharmacies, although PBM's may operate mail-order businesses.

31.     The retail payment side of the market for drugs is largely directed and controlled by insurance companies and health plan administrators, including PBMs. In many instances where a health plan provides for prescription drug benefits, a PBM administers the prescription drug component of a health plan.

32.     When a patient presents a prescription at a pharmacy, key information such as the patient's name, drug dispensed and quantity dispensed is input into the pharmacy computer and transmitted via interstate wire to a "switch" that then directs the information to the correct PBM. Accordingly, the pharmacy instantaneously submits the claim to Defendant on behalf of the patient. The prescription is supposed to be processed by the PBM in accordance with a patient's Plan which, as alleged herein, did not occur. The PBM then electronically transmits via interstate wire a message back to the pharmacy indicating whether the drug and patient are covered and, if so, the cost-sharing amount the pharmacy must charge to and collect from the patient as a copayment, coinsurance, or the amount to be paid toward a deductible.

33.     The PBM is supposed to pay the pharmacy any amounts owed to the pharmacy over the copayment, coinsurance or deductible amount paid by the patient. These amounts are aggregated and paid to the pharmacy approximately every two weeks for the claims that were processed by any given pharmacy in the prior two-week period.

34.     If the patient's cost-sharing payment is greater than the amount the pharmacy has agreed to accept, there will be a "negative reimbursement" to the pharmacy for the difference between the patient's payment and the amount the pharmacy receives. The "negative reimbursement" is paid by the pharmacy to Defendant as part of the reconciliation every two weeks.

### The relevant contractual relationships

35.     Contractual relationships exist at three relevant levels: (1) between the employer (or, in the case of non-employer sponsored plans, the individual) and the entity that underwrites and/or administers the plan; (2) between the administrator and the PBM; and (3) between the PBM and retail pharmacies. An employer or individual buys prescription drug coverage or prescription drug benefit administration services from a company to provide prescription drug benefits for its employees under health plans. When a sponsor does not contract directly with a PBM, a health insurance company may hire a PBM to manage the prescription drug benefits offered pursuant to its policies and ASO contracts. PBMs have relationships with retail pharmacies. Some may be "in-network" and others may be "out of network."

36.     The following diagram represents (in simplified form) the contractual relationships among the parties:



(a)     **Agreement between employer/individual and administrator/insurer (i.e., health plans).** Employers and individuals buy prescription drug coverage to provide prescription drug benefits. These plans contain uniform provisions that set forth key terms such as

the mechanism for and amount of the deductible, copayment, and/or coinsurance that a patient must pay to obtain prescription drug benefits. Plaintiffs and Class members are intended beneficiaries of such agreements and they are participants and beneficiaries in the plans.

(b)     **Agreement between administrator/insurer and PBM**. In certain circumstances, the administrator or insurer will contract with a PBM, which act as its agent in administering the prescription drug benefits purchased through the health plans that the insurers issue or administer. In other circumstances, the administrator manages the prescription benefits itself.

(c)     **Agreement between administrator/PBM and pharmacy**. For "in-network" benefits at issue in this case, PBMs contract with pharmacies, which serve as providers in the insurers/administrators' pharmacy network. Pursuant to these agreements, the pharmacies fill prescriptions that are health benefits covered under the Plans in exchange for an amount pursuant to the contract with the PBM. Pursuant to these agreements, the pharmacy submits a claim to the PBM on behalf of the patient. The pharmacy has no role in setting the amount of the patient's payment and thus must collect and remit to administrator/PBM the amount overcharged as determined by the administrator/PBM in their sole discretion.

37.     The relationship among the parties is shown graphically as follows:



38.     Pursuant to the health plans, PBMs must follows the plans' terms, including when dictating to pharmacies the amounts to charge patients in cost-sharing payments. In other words, PBMs must not overcharge patients for their prescription drug benefits.

39.     On the contrary, PBMs — whether they are also acting as administrators or as agents with administrators/insurers — routinely require that patients pay substantially higher prices for prescription drugs than are allowed under the plans. As alleged herein, Defendant engaged in such practices with respect to Plaintiffs' Plans and the Class by charging Overcharges.

**Plaintiffs' Plan**

40.     Pursuant the Plan, BCBS "will provide Benefits in accordance with the Coinsurance percentage shown in the Schedule of Benefits toward Allowable Charges incurred for Covered Services by a Member during a Benefit Period." The Plan defines the preceding and other underlined Plan terms as follows:

(a)     Benefits are "Coverage for healthcare services, treatment, procedures, equipment, **drugs**, devices, items or supplies covered under this Plan." "[BCBS] base[s] the payment for Benefits on the Allowable Charge for Covered Services."

- 13 -

(b)      Coinsurance is "[t]he sharing of Allowable Charges for Covered Services. The sharing is expressed as a pair of percentages, a Company percentage that [BCBS]  pay[s], and a Member percentage that [Members] pay. Once the Member has met any applicable Deductible Amount, the Member's percentage will be applied to the Allowable Charges for Covered Services to determine the Member's financial responsibility. [The Company] percentage will be applied to the Allowable Charges for Covered Services to determine the Benefits provided."

(c)      Allowable Charge is, with respect to participating providers, "The lesser of the billed charge or the amount [BCBS] establish[es] or negotiate[s] as the maximum amount allowed for services from these Providers covered under the terms of this Benefit Plan."

(d)      Covered Service is "[a] service or supply specified in this Benefit Plan for which Benefits are available when rendered by a Provider."

41.      The Benefits provided by BCBS are subject to deductible amounts and maximum limitations.

42.      The Prescription Drug Deductible Amount is "[t]he dollar amount, as shown in the Schedule of Benefits, of charges for Covered Prescription Drugs that the Member must pay within a Benefit Period before this Benefit Plan starts paying Prescription Drug Benefits. For Members in a class of coverage with more than one Member, the Family Prescription Drug Deductible Amount is the maximum amount required to satisfy the Prescription Drug Deductible Amount for the family. Once a family has met its Family Prescription Drug Deductible Amount, this Benefit Plan starts paying Benefits for all Members of the family, regardless of whether each individual family Member has met his individual Prescription Drug Deductible Amount. However, no family Member may contribute more than his individual Prescription Drug Deductible Amount to satisfy the aggregate Prescription Drug Deductible Amount required of a

- 14 -

family. Only Prescription Drug Deductible Amounts accrue to the Family Prescription Drug Deductible Amount."

43.     Under their Schedule of Benefits, Plaintiffs' <u>Prescription Drug Deductible Amount</u> was $1,000.

44.     BCBS is required to provide Prescription Drug Benefits pursuant to the terms of the Plan.  "Benefits are based on the Allowable Charge that [BCBS] determine[s] and only those Prescription Drugs that [BCBS] determine[s] are Medically Necessary will be covered."

45.     The Allowable Charge is based on the amount BCBS agrees to pay the pharmacy. The Plan states: "[s]ome pharmacies have contracted with [BCBS] or with [its] pharmacy Benefit manager to accept a negotiated amount as payment in full for the covered Prescription Drugs that they dispense. These pharmacies are '<u>Participating Pharmacies</u>.' Benefits are based on the Allowable Charge as determined by [BCBS]. The Allowable Charge for covered Prescription Drugs purchased from Participating Pharmacies is the negotiated amount and it is used to base [BCBS]s] payment for the Member's covered Prescription Drugs."

46.     Moreover, "[t]he Prescription Drug Deductible, if shown on the Schedule of Benefits, must be satisfied before any Copayment or Coinsurance will apply. If the Member has not met his Prescription Drug Deductible, the Participating Pharmacy may collect one hundred percent (100%) of the ***discounted costs*** of the drug at the point of sale. If the member has met his Prescription Drug Deductible, he will pay the Copayment or Coinsurance percentage shown on the Schedule of Benefits. The Participating Pharmacy will electronically submit the claim for the Member." (Emphasis added.)

47.     The coinsurance percentages applicable to a prescription drug purchase depend on whether the prescription drug is categorized as Tier 1 (generic drugs) or Tier 2 (brand-name

drugs). Under the Schedule of Benefits, after participants satisfy their $1,000 Prescription Drug Deductible Amount but before they reach the $2,000 Prescription Drug Out-of-Pocket Maximum Amount, the following percentages apply to prescription drug purchases:

|  | Company | Member |
|---|---|---|
| Tier 1 Generic Drugs | 100% | 0% |
| Tier 2 Brand-Name Drugs | 50% | 50% |

### BCBS's Plans have standard terms

48.     The relevant terms of Plaintiffs' Plan are substantively the same as those applicable to the Class. For this reason, upon information and belief, the rights relevant to the claims alleged herein are shared by all members of the Class.

49.     Further, BCBS uses uniform prescription drug plan terms in its Plan contracts to provide prescription drug coverage. These terms of the Plans — and more importantly, how these Plans are administered by BCBS — do not differ materially across Plans. Accordingly, upon information and belief, the rights relevant to the claims alleged herein are shared by all members of the Class, regardless of the funding arrangement underpinning the health Plan benefits that Defendant offers and administers.

### Plaintiffs' purchases

50.     During the time that Plaintiffs were covered by the Plan, Plaintiffs purchased prescription drugs for which they were required to make cost-sharing payments (e.g., copayments, coinsurance, and/or deductible payments) that exceeded the amounts set forth in their Plan, including at least the following specific purchases.

51.     On October 27, 2017 and November 20, 2017, Plaintiff Bennett was overcharged when she purchased a brand-name prescription drug ("Drug A") from a

participating pharmacy. Because she had not yet reached her $1,000 Prescription Drug Deductible Amount, she should have paid 100% of the Allowable Charge. But Plaintiff Bennett paid more than 100% of the Allowable Charge because she paid $123.96 when the pharmacy was paid only $121.12 for Drug A. Bennett was overcharged by $2.84 on each purchase. The EOBs received by Plaintiff Bennett falsely represented that the pharmacy was paid $123.96 for each of these transactions.

52.     On August 20, 2018 and October 3, 2018, Plaintiff Mannino was overcharged when she purchased a brand-name prescription drug ("Drug B") from a participating pharmacy. Because she had reached her $1,000 Prescription Drug Deductible Amount, she should have paid 50% of the Allowable Charge. But Plaintiff Mannino paid more than 50% of the Allowable Charge because she paid $69.01 when the pharmacy was paid $134.05 for Drug B. Mannino was overcharged $1.99 on each purchase. The EOBs received by Plaintiff Mannino falsely represented that the pharmacy was paid $138.01 for each of these transactions.

53.     On July 19, 2018, Plaintiff Mannino was overcharged when she purchased a brand-name prescription drug ("Drug C") from a participating pharmacy. Because she had reached her $1,000 Prescription Drug Deductible Amount, she should have paid 50% of the Allowable Charge. But Plaintiff Mannino paid more than 50% of the Allowable Charge because she paid $100.63 when the pharmacy was paid $196.91 for Drug C. Mannino was overcharged $2.18 on this purchase. The EOBs received by Plaintiff Mannino falsely represented that the pharmacy was paid $201.26 for this transaction.

54.     On May 14, 2018, Plaintiff Mannino was overcharged when she purchased a brand-name prescription drug ("Drug B") from a participating pharmacy. Because she had reached her $1,000 Prescription Drug Deductible Amount, she should have paid 50% of the

Allowable Charge. But Plaintiff Mannino paid more than 50% of the Allowable Charge because she paid $69.03 when the pharmacy was paid $134.94 for Drug B. Mannino was overcharged $1.56 on this purchase. The EOBs received by Plaintiff Mannino falsely represented that the pharmacy was paid $138.06 for this transaction.

55.     On April 9, 2018, Plaintiff Mannino was overcharged when she purchased a brand-name prescription drug ("Drug D") from a participating pharmacy. Because she had reached her $1,000 Prescription Drug Deductible Amount, she should have paid 50% of the Allowable Charge. But Plaintiff Mannino paid more than 50% of the Allowable Charge because she paid $346.39 when the pharmacy was paid $678.86 for Drug D. Mannino was overcharged $6.96 on this purchase. The EOBs received by Plaintiff Mannino falsely represented that the pharmacy was paid $692.78 for this transaction.

56.     The amounts relevant to the prescription drug purchases described above are summarized in the following table:

| Patient | Date | Drug | Claimed cost | Cost share | Actual cost | Correct cost share | Overcharge |
|---------|------|------|--------------|------------|-------------|--------------------|------------|
| Bennett | 11/20/17 | A | $123.96 | $123.96 | $121.12 | $121.12 | $2.84 |
| Bennett | 10/27/17 | A | $123.96 | $123.96 | $121.12 | $121.12 | $2.84 |
| | | | | | | | |
| Mannino | 10/3/18 | B | $138.01 | $69.01 | $134.05 | $67.03 | $1.99 |
| Mannino | 8/20/18 | B | $138.01 | $69.01 | $134.05 | $67.03 | $1.99 |
| Mannino | 7/19/18 | C | $201.26 | $100.63 | $196.91 | $98.46 | $2.18 |
| Mannino | 5/14/18 | B | $138.06 | $69.03 | $134.94 | $67.47 | $1.56 |
| Mannino | 4/9/18 | D | $692.78 | $346.39 | $678.86 | $339.43 | $6.96 |

57.     As set forth above, Plaintiffs were illegally assessed Overcharges for these prescription drugs in excess of the amounts permitted by their Plan. Defendant profited from this conduct because it either (1) paid less than it should have or (2) clawed back these overcharges.

- 18 -

## ADMINISTRATIVE REMEDIES INAPPLICABLE OR
## DEEMED EXHAUSTED

58.        Plaintiffs and the Class are not required to exhaust administrative remedies.

Only a claim under ERISA § 502(a)(1)(B), 29 U.S.C. § 1132(a)(1)(B), could concern exhaustion

of administrative remedies.  Accordingly, only Count I is arguably implicated by that doctrine.

However, the exhaustion doctrine does not apply to that or any other Count because the Plan's

administrative remedies do not apply to overcharges. In addition, because BCBS failed to

respond to Plaintiffs' written appeal, they have, and should be deemed to have, exhausted any

applicable administrative remedies.

### The Plan's administrative remedies are inapplicable to overcharges

59.        The Plan states that "[i]f a Member is an ERISA Member, the Member is

required to complete the first level of Appeal prior to instituting any civil action under ERISA

section 502(a)."

60.        However, the Plan's appeal procedures do not apply to the Overcharges.

According to the Plan, an Appeal is "[a] written request from a Member or authorized

representative to change an Adverse Benefit Determination made by Us." An Adverse Benefit

Determination "[m]eans denial or partial denial of a Benefit, in whole or in part, based on . . .

Medical Necessity, appropriateness, healthcare setting, level of care, effectiveness or treatment is

determined to be experimental or investigational; . . . the Member's eligibility to participate in

the Benefit Plan; . . . any prospective or retrospective review determination; . . . or a Rescission

of Coverage."

61.        Here, after the pharmacy collected the cost-sharing payments and dispensed the

drugs, the pharmacy was paid in full. When that occurred, Plaintiffs received their prescriptions

and received their benefits in full. Accordingly, this case does not concern a denial of benefits or

an adverse benefit decision. It concerns an unlawful Overcharge.  Accordingly, the Plan's
administrative remedies do not apply.

62.     Because there has been no "adverse benefit determination" as that term is
defined in the Plan, no appeal is necessary, and accordingly, the Plan requires nothing more
before Plaintiffs can bring a lawsuit under ERISA.

**Plaintiffs appealed**

63.     Plaintiffs exhausted the administrative remedies in their Plans even though such
administrative remedies do not apply to Overcharges.

64.     Plaintiffs mailed their written appeal to BCBS's Appeals and Grievance Unit on
December 5, 2018. Under the Plan, BCBS was required to respond within 30 days: "The
administrative Appeal decision will be mailed to the Member, his authorized representative, or a
Provider authorized to act on the Member's behalf, within thirty (30) days of receipt of the
Member's request; unless it is mutually agreed that an extension of time is warranted."

65.     As of March 13, 2019, BCBS has still not responded to Plaintiffs' written
appeal. Because BCBS has failed to follow its own administrative procedures, Plaintiffs are
deemed to have exhausted the administrative remedies available under the Plan and entitled to
pursue any available remedies under section 502(a) of ERISA. *See* 29 C.F.R. § 2560.503–1.

**BCBS PARTICIPANTS PAY UNDISCLOSED, UNAUTHORIZED AND
EXCESSIVE PRESCRIPTION DRUG COST SHARES**

66.     Defendant has engaged in a scheme to charge Plaintiffs and other patients
Overcharges in violation of the Plans as alleged above.

67.     Defendant utilizes BCBS's technology and service platforms, retail network
contracting and claims processing services to carry out this Overcharge and Clawback Scheme.

68.     BCBS uses its platforms to create and implement its unlawful Overcharge Scheme. Defendant exercised its discretion to program and manipulate its and its Pharmacy Benefit Manager's technology and service platforms to violate the Plan's term and charge greater Cost-Sharing Amounts than the Plans permitted. Defendant also exercised its discretion to input the excessive and unlawful cost-sharing data into the platform system to enable the system to overcharge patients.

69.     Defendant further used its discretion to manipulate the BCBS System to misrepresent to patients the "Cost-Sharing Amounts (e.g. Co-payment, Coinsurance and Deductible) applicable to Covered Prescription Services" that were inflated, false and in violation of the Plans. Defendant required the pharmacies to make these misrepresentations to Plaintiffs and other patients when they filled their prescriptions. For example, Defendant made these misrepresentations to Plaintiffs each time they filled a prescription and were advised of and required to pay an excessive Copayment and Spread as alleged above.

70.     Where the patient pays a deductible and/or coinsurance (not a copayment), the patient is overcharged because his or her payment is based on the inflated amount, ***not*** the lower amount paid to the pharmacy. Defendant implemented the scheme concerning these types of cost-sharing in the same way it executed the scheme concerning copayments.

71.     BCBS's Overcharge Scheme includes various misrepresentations and omissions of material fact, including, but not limited to: (1) the misrepresentation in the Plans that Plaintiffs would pay a certain cost-share amount for prescription drugs with the knowledge and intent that patients would in fact be charged a higher amount; (2) the misrepresentation of the amount of the cost-sharing payment owed under the Plan terms when a patient purchased a drug; (3) the failure to disclose that a material portion of the "co-payments" were not "co-" payments at all, but were

unlawful Overcharges; (4) the failure to disclose that prescription drug payments under

deductible portions of health insurance Plans were based on prescription drug prices that

exceeded the contracted fee with the pharmacies, in violation of the Plans' plain language; and

(5) the failure to disclose that co-insurance payments were based on prescription drug prices that

exceeded the contracted fee with the pharmacies, in violation of the Plans' plain language.

72.    A June 28, 2016 press release issued by the NCPA described the "Clawback"

practice and how it was impacting pharmacists and consumers throughout the United States.[3]

The press release went on to discuss a survey that was conducted by the NCPA of its members

between June 2 and June 17, 2016, which disclosed the following:

> "Clawbacks" are relatively common, as 83 percent of pharmacists witnessed them
> at least 10 times during the past month.
>
> Two-thirds (67 percent) said the practice is limited to certain PBMs.
>
> Most (59 percent) said they believe the practice occurs in Medicare Part D plans as
> well as commercial ones.
>
> Sometimes PBM corporations impose "gag clauses" that prohibit community
> pharmacists from volunteering the fact that a medication may be less expensive if
> purchased at the "cash price" rather than through the insurance plan. In other words,
> the patient has to affirmatively ask about pricing. Most pharmacists (59 percent)
> said they encountered these restrictions at least 10 times during the past month.[4]

73.    Some of the comments received from the pharmacists who responded to the

survey included:

> "Got one today. [PBM] charging a patient $125 for a generic drug and take back
> $65 from the pharmacy. If paid cash the cost to the patient would have been $55."

---

[3]    News Releases, NCPA, Pharmacists Survey: Prescription Drug Costs Skewed by Fees on
Pharmacies, Patients (June 28, 2016), http://www.ncpanet.org/newsroom/news-
releases/2016/06/28/pharmacists-survey-prescription-drug-costs-skewed-by-fees-on-pharmacies-
patients (last visited Jan. 9, 2017); see also Survey of Community Pharmacies, NCPA (2016),
http://www.ncpa.co/pdf/dir_fee_pharamcy_survey_june_2016.pdf (last visited Jan. 9, 2017).

[4]    *Id.*

***

"Simvastatin 90-day charged the patient $30 more than cash price."

***

"[A] patient copay is over $50 and the claw back is over $30 all for a drug while our cash price would only be $15."

***

"The ones that make me the most upset is the Champ/VA claims. Seeing our disabled veterans families paying more than they should is horrific. Many times these fees are multiple times our net margin, even a negative reimbursement at times. One recent copay of $30 while we sent $27.55 back to [PLAN] left our margin at $1.58."

***

"Same patient, same day, five prescriptions. … Total copay $146.89. Total claw back $134.49. Total price of the five prescriptions $12.40. Our gross profit on these five drugs $3.79. These are all maintenance medications for this patient."

***

"Recently filled a buproprion xl 150 script for 30 tabs. Cost is $17.15. PBM required us to charge a patient $47.10 and then took back $35."[5]

74.      Clearly, these examples of Overcharges could not be possible if the true cost and correct cost-share of the prescription drug was disclosed.

75.      Clawback programs are becoming more commonplace in the healthcare industry and have "the effect of duping average consumers of prescription drugs into unwittingly funding [corporate] profits."[6]

---

[5]    See Community pharmacists describe PBM copay clawbacks on patients, NCPA.CO (2016), http://www.ncpa.co/pdf/06-27-16-copay-clawbacks.pdf (last visited Jan. 9, 2017).

[6]    Susan Hayes, Testimony Before the Employee Benefit Security Administration Advisory Council on Employee Welfare and Pension Benefit Plans, U.S. Department of Labor, Hearing on PBM Compensation and Fee Disclosures (Aug. 20, 2014), https://www.dol.gov/sites/default/files/ebsa/about-ebsa/about-us/erisa-advisory-council/AChayes082014.pdf.

76.     Lawmakers, customers, and pharmacists have all raised concerns that there is a dangerous lack of transparency, rendering it difficult to assess whether an insurance policy or plan is being administered in compliance with plan or contract terms.[7]

77.     Potential waste and abuse in the administration of these plans has not gone unnoticed by the Department of Labor — which has the authority to enforce ERISA. In response, the ERISA Advisory Council, established under ERISA, held a hearing in August 2014.

78.     At the hearing, the Council heard testimony regarding "a new PBM phenomenon, called 'clawback'" which takes advantage of the lack of transparency in the PBM industry According to testimony provided to the Council:

> In a "clawback" situation, the patient presents a prescription at a pharmacy. The claim is processed and the pharmacist is instructed to collect $100 as the cost of the drug. The entire prescription is paid for by the patient. Two weeks later, when the pharmacist receives reimbursement from the PBM, his remittance statement shows that the PBM has taken back (clawed-back) $75. This leaves just enough so that the pharmacist may make a few dollars profit on the claim. What happens to the $75 difference? The PBM retains this amount as "Spread" paid for by the patient.[8]

### DEFENDANT IS A FIDUCIARY AND PARTY IN INTEREST

79.     Plaintiffs and the members of the Class (as defined below) are participants in employee welfare benefit plans as that term is defined in 29 U.S.C. § 1002(1)(A), insured or administered by Defendant to provide participants with medical care and prescription medications.

---

[7]    National Community Pharmacists Association, Lawmakers Ask Medicare for More Drug Payment Transparency (Oct. 22, 2015), http://www.ncpanet.org/newsroom/news-releases/2015/10/22/lawmakers-ask-medicare-for-more-drug-payment-transparency.

[8]    Hayes, supra note 22 at 7.

80.      ERISA requires every plan to provide for one or more named fiduciaries who will have "authority to control and manage the operation and administration of the plan." ERISA § 402(a)(1), 29 U.S.C. § 1102(a)(1).

81.      ERISA treats as fiduciaries not only persons explicitly named as fiduciaries under § 402(a)(1), 29 U.S.C. § 1102(a)(1), but also any other persons who in fact perform fiduciary functions. Thus, a person is a fiduciary to the extent "(i) he exercises any discretionary authority or discretionary control respecting management of such plan or exercises any authority or control respecting management or disposition of its assets, (ii) he renders investment advice for a fee or other compensation, direct or indirect, with respect to any moneys or other property of such plan, or has any authority or responsibility to do so, or (iii) he has any discretionary authority or discretionary responsibility in the administration of such plan." ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A). This is a functional test. Neither "named fiduciary" status nor formal delegation is required for a finding of fiduciary status, and contractual agreements cannot override finding fiduciary status when the statutory test is met.

82.      The Plan states: "In addition to creating rights for Members, ERISA imposes duties upon the people who are responsible for the operation of the Employee Benefit Plan. The people who operate the plan, called 'fiduciaries' of the plan, have a duty to do so prudently and in the interest of the Subscriber and other beneficiaries."

83.      Defendant is a fiduciary of all of the ERISA Plans to which it provided prescription drug benefits or for which it administered prescription drug benefits in that it *exercised* discretionary authority or control respecting the plan and plan asset management activities, ERISA § 3(21)(A)(i), 29 U.S.C. § 1002(21)(A)(i), and in that it *had* discretionary

- 25 -

authority or discretionary responsibility in the administration of the ERISA Plans of participants and beneficiaries in the Class, ERISA § 3(21)(A)(iii), 29 U.S.C. § 1002(21)(A)(iii).

84.    Defendant *had* fiduciary authority over benefit administration under the ERISA Plans in that it operated and controlled the prescription drug benefits under the ERISA.

85.    Defendant is also a fiduciary because it *exercised* fiduciary authority over plan management, in addition to *having* fiduciary authority over plan administration. By way of example, it:

(a)    exercised discretion to violate the Plans to calculate and set the amount of and charge patients Overcharges;

(b)    had and exercised discretion to set up a computer system to process prescription drug claims and exercised discretion to program and input data into that system which it used to intentionally set the amount of Overcharges in violation of the Plans (*i.e.*, these were not unintentional miscalculations);

(c)    had and exercised discretion to dictate the amount of and require pharmacies to charge and collect the Overcharges;

(d)    exercised discretion to require the pharmacies to remit some or all of the Overcharges to Defendant as Clawbacks;

(e)    exercised discretion to set its own compensation for services performed as fiduciaries by dictating Overcharges and Clawbacks;

(f)    exercised discretion to unilaterally collect its own compensation for services performed by causing Overcharges and collecting Clawbacks;

(g)    exercised discretion concerning whether to disclose Overcharges or Clawbacks;

(h)    exercised discretion to require pharmacies to misrepresent to patients the proper cost-sharing amounts and prevent pharmacies from disclosing to patients the proper cost-sharing amounts and the manner in which it charged for prescription drugs as alleged above;

(i)    exercised discretion to prohibit pharmacies from disclosing to patients the existence or amount of the Overcharges; and

(j)    exercised discretion to prohibit pharmacies from disclosing to patients that they could purchase drugs at a price lower than the amount set by Defendant by not using their insurance or prescription benefits.

86.    In addition to its fiduciary status under the foregoing provisions, Defendant is a fiduciary in that it *exercised* authority or control respecting management or disposition of plan assets. The insurance and ASO contracts underpinning the Plans are "plan assets" within the meaning of ERISA plan assets, ERISA § 3(21)(A)(i), 29 U.S.C. § 1002(21)(A)(i). Additionally, under coinsurance plans, the payments by the Plan and employers (and related trusts) for prescription drugs are plan assets. Defendant used its authority and control over these Plan assets and cost-sharing amounts to implement its Overcharge and Clawback scheme.

87.    Defendant exercised control over the amounts paid by both employers/trusts and participants/beneficiaries by dictating that pharmacies charge Overcharges, as alleged above. Defendant exercised control and authority over the insurance policies, ASO contracts, and PBM agreements in that it used these contracts — from which it derived discretion and control over plan prescription drug management and pricing — to implement the Overcharge scheme, as alleged above.

88.    Defendant is also a party in interest under ERISA because (1) it is a fiduciary, ERISA § 3(14)(A), 29 U.S.C. § 1002(14)(A); and/or (2) it provided plan administration, and/or

pharmacy benefit management services to the ERISA Plans, ERISA § 3(14)(B), 29 U.S.C.

§ 1002(14)(B).

89.    As a party in interest, Defendant received direct and indirect compensation for

services, some of which was in the form of excess Overcharge or Clawback fees that were

collected in exchange for few to no services. Defendant also received and used plan assets for the

benefit of itself and its affiliates to impose its Overcharge and Clawback Scheme on the Class.

## DEFENDANT'S ERISA DUTIES

90.    **The Statutory Requirements:** ERISA imposes strict fiduciary duties upon plan

fiduciaries. ERISA § 404(a), 29 U.S.C. § 1104(a), states, in relevant part, that:

> [A] fiduciary shall discharge his duties with respect to a plan solely in the interest
> of the participants and beneficiaries and . . . for the exclusive purpose of providing
> benefit to participants and their beneficiaries; and defraying reasonable expenses of
> administering the plan; with the care, skill, prudence, and diligence under the
> circumstances then prevailing that a prudent man acting in a like capacity and
> familiar with such matters would use in the conduct of an enterprise of like
> character and with like aims; by diversifying the investments of the plan so as to
> minimize the risk of large losses, unless under the circumstances it is clearly
> prudent not to do so; and in accordance with the documents and instruments
> governing the plan insofar as such documents and instruments are consistent with
> the provisions of this title and Title IV.

91.    **The Duty of Loyalty.** ERISA imposes on a plan fiduciary the duty of loyalty —

that is, the duty to "discharge his duties with respect to a plan solely in the interest of the

participants and beneficiaries and . . . for the exclusive purpose of . . . providing benefits to

participants and their beneficiaries . . . ." The duty of loyalty entails a duty to avoid conflicts of

interest and to resolve them promptly when they occur. A fiduciary must always administer a

plan with an "eye single" to the interests of the participants and beneficiaries, regardless of the

interests of the fiduciaries themselves or the plan sponsor.

92.    **The Duty of Prudence.** Section 404(a)(1)(B) also imposes on a plan fiduciary

the duty of prudence — that is, the duty "to discharge his duties with respect to a plan solely in

- 28 -

the interest of the participants and beneficiaries and . . . with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man, acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims. . . ."

93.    **The Duty to Inform.** The duties of loyalty and prudence include the duty to disclose and inform. These duties entail: (1) a negative duty not to misinform; (2) an affirmative duty to inform when the fiduciary knows or should know that silence might be harmful; and (3) a duty to convey complete and accurate information material to the circumstances of participants and beneficiaries.

94.    **Prohibited Transactions.** ERISA's prohibited transaction rules bar fiduciaries from certain acts because they are self-interested or conflicted and therefore become per se violations of ERISA § 406(b) — or because they are improper "party in interest" transactions under ERISA § 406(a). As noted above, under ERISA, a "party in interest" includes a fiduciary, as well as entities providing any "services" to a plan, among others. *See* ERISA § 3(14), 29 U.S.C. § 1002(14). ERISA's prohibited transaction rules are closely related to ERISA's duties of loyalty, which are discussed above.

95.    ERISA § 406(a) provides that transactions between a plan and a party in interest are prohibited transactions unless they are exempted under ERISA § 408:

(a) Transactions between plan and party in interest

Except as provided in section 1108 of this title:

(1) A fiduciary with respect to a plan shall not cause the plan to engage in a transaction, if he knows or should know that such transaction constitutes a direct or indirect —

(A) sale or exchange, or leasing, of any property between the plan and a party in interest;

- 29 -

(B) lending of money or other extension of credit between the plan and a party in interest;

(C) furnishing of goods, services, or facilities between the plan and a party in interest;

(D) transfer to, or use by or for the benefit of a party in interest, of any assets of the plan; or

(E) acquisition, on behalf of the plan, of any employer security or employer real property in violation of section 1107(a) of this title.

29 U.S.C. § 1106(a).

    96.      ERISA § 406(b), provides:

A fiduciary with respect to a plan shall not —

(1) deal with the assets of the plan in his own interest or for his own account,

(2) in his individual or in any other capacity act in any transaction involving the plan on behalf of a party (or represent a party) whose interests are adverse to the interests of the plan or the interests of its participants or beneficiaries, or

(3) receive any consideration for his own personal account from any party dealing with such plan in connection with a transaction involving the assets of the plan.

29 U.S.C. § 1106(b).

    97.      **The Duty to Monitor.** In addition, a fiduciary that appoints another person to fulfill all or part of its duties, by formal or informal hiring, subcontracting, or delegation, assumes the duty to monitor that appointee or delegatee to protect the interests of the ERISA participants and beneficiaries. As noted above, the power to appoint, retain, and remove plan fiduciaries or service providers confers fiduciary status upon the person holding such power.

    98.      **Rights of Action Under the Plans, for Fiduciary Breach, Prohibited Transactions, and Related Claims.** ERISA § 502(a)(1)(B), 29 U.S.C. § 1132(a)(1)(B), provides that a participant or beneficiary may bring an action to enforce rights under the terms of the plan or to clarify his rights to future benefits under the terms of the plan. Further, ERISA § 502(a)(3),

- 30 -

29 U.S.C. § 1132(a)(3), authorizes individual participants and fiduciaries to bring suit "(A) to enjoin any act or practice which violates any provision of this subchapter or the terms of the plan, or (B) to obtain other appropriate equitable relief (i) to redress such violations or (ii) to enforce any provisions of this subchapter or the terms of the plan." The remedies available pursuant to § 502(a)(3) include remedies for breaches of the fiduciary duties set forth in ERISA § 404, 29 U.S.C. § 1104, and for violation of the prohibited transaction rules set forth in ERISA § 406, 29 U.S.C. § 1106. Further, ERISA § 502(a)(2), 29 U.S.C. § 1132(a)(2), permits a plan participant, beneficiary, or fiduciary to bring a suit for relief under ERISA § 409. ERISA § 409, 29 U.S.C. § 1109, provides, *inter alia*, that any person who is a fiduciary with respect to a plan and who breaches any of the responsibilities, obligations, or duties imposed on fiduciaries by ERISA shall be personally liable to make good to the plan any losses to the plan resulting from each such breach and to restore to the plan any profits the fiduciary made through use of the plan's assets. ERISA § 409 further provides that such fiduciaries are subject to such other equitable or remedial relief as a court may deem appropriate. Because Plaintiffs may plead their claims in the alternative and because not all the remedies Plaintiffs seek are available under all sections of ERISA, Plaintiffs bring their ERISA claims pursuant to ERISA § 502(a)(3) and (2), as well as § 502(a)(1)(B).

## DEFENDANT BREACHED ITS FIDUCIARY DUTIES

99.      Defendant breached the terms of the ERISA Plans, committed breaches of fiduciary duty, engaged in prohibited transactions, and harmed Plaintiffs and Class members in the following ways:

(a)      Defendant wrongfully charged Plaintiffs and Class members excessive and unlawful copayments and Spread;

(b)    Defendant wrongfully charged Class members excessive and unlawful coinsurance payments in that, rather than charging a percentage of the amounts paid to the pharmacies for the dispensed drugs, the coinsurance payments were based on substantially inflated amounts;

(c)    Defendant wrongfully charged Plaintiffs and Class members excessive and unlawful deductible payments in that rather than being charged the lesser of the applicable per occurrence deductible fee or the amount paid to the pharmacy for the dispensed drug, Plaintiffs and Class members were charged deductible fees that were higher;

(d)    Defendant wrongfully used a computer system and data it input into that system to charge patients unlawful Overcharges and dictate the excessive amounts pharmacies charged patients for prescription drugs;

(e)    Defendant wrongfully required pharmacies to charge patients unlawful Overcharges;

(f)    Defendant wrongfully required pharmacies to collect the unlawful Overcharges and pay Overcharges back to Defendant as Clawbacks;

(g)    Defendant wrongfully misrepresented to patients the proper cost-sharing amounts at the time patients filled their prescriptions and were charged by pharmacies;

(h)    Defendant misrepresented the cost-sharing terms, practices and procedures in the Plan terms;

(i)    Defendant willfully failed to disclose to patients the proper cost-sharing amounts and the manner in which it charged for prescription drugs;

(j)    Defendant wrongfully determined the amount of and collected additional unlawful undisclosed Clawback compensation;

- 32 -

(k)    Defendant wrongfully determined the amount of and collected additional unlawful undisclosed Clawback premium payment;

(l)    Defendant set, changed, and collected its own compensation for services performed as a fiduciary by collecting Clawbacks; and

(m)    Defendant failed to monitor its agents, appointees, vendors, formal delegatees, and informal designees in the performance of their fiduciary duties.

## CLASS ACTION ALLEGATIONS

100.    Plaintiffs brings this action as a class action pursuant to Rule 23(b)(1), (2) and (b)(3) of the Federal Rules of Civil Procedure on behalf of themselves and the Class defined as follows:

> **Class**. All participants or beneficiaries who are enrolled in a health benefit plan insured or administered by Blue Cross and Blue Shield of Louisiana and subject to ERISA who purchased one or more prescription drugs pursuant to such plan and paid an amount for such drug(s) that was higher than the payment amount provided by such plan.

101.    Excluded from the Class are Defendant, any of its parent companies, subsidiaries, and/or affiliates, its officers, directors, legal representatives, and employees, any co-conspirators, all governmental entities, and any judge, justice, or judicial officer presiding over this matter.

102.    Plaintiffs reserve the right to redefine the Class prior to certification.

103.    **Class Period.** Plaintiffs will seek class certification, losses, and other available relief for fiduciary breaches and prohibited transactions occurring within the entire period allowable under law, including, but not limited to, ERISA § 413, 29 U.S.C. § 1113, and its fraud or concealment tolling provisions and the doctrine of equitable tolling. Further, Plaintiffs reserve the right to refine the Class Period after they have learned the extent of Defendant's fraud, the length of its concealment, and the time period during which "Clawbacks" were taking place.

104.    This action is brought, and may properly be maintained, as a Class action pursuant to Fed. R. Civ. P. 23. This action satisfies the numerosity, typicality, adequacy, predominance, and superiority requirements of those provisions.

105.    The Class is so numerous that the individual joinder of all of its members is impracticable. Due to the nature of the trade and commerce involved, Plaintiffs believe that the total number of Class members is in the thousands and that the members of the Class are geographically dispersed across the United States. While the exact number and identities of the Class members are unknown at this time, such information can be ascertained through appropriate investigation and discovery.

106.    Plaintiffs' claims are typical of the claims of the members of the Class because Plaintiffs' claims, and the claims of all Class members, arise out of the same conduct, policies and practices of Defendant as alleged herein, and all members of the Class are similarly affected by Defendant's wrongful conduct.

107.    There are questions of law and fact common to the Class and these questions predominate over questions affecting only individual Class members. Common legal and factual questions include, but are not limited to:

(a)    Whether Defendant is a fiduciary under ERISA;

(b)    Whether Defendant is party in interest under ERISA;

(c)    Whether Defendant breached its fiduciary duties in failing to comply with ERISA as set forth above;

(d)    Whether Defendant's acts as alleged above breached ERISA's prohibited transaction rules;

- 34 -

(e)      Whether Defendant knowingly participated in and/or knew or had constructive knowledge of violations of ERISA, including breaches of fiduciary duty;

(f)      Whether Defendant violated the Plans' terms by authorizing or permitting pharmacies to collect and then remit Overcharges, including Spread amounts to them and thereby overcharged subscribers for prescription drugs;

(g)      Whether the members of the Class have sustained losses and/or damages and/or Defendant have been unjustly enriched, and the proper measure of such losses, and/or damages, and/or unjust enrichment; and

(h)      Whether the members of the Class are entitled to declaratory and/or injunctive relief.

108.      Plaintiffs will fairly and adequately represent the Class and has retained counsel experienced and competent in the prosecution of class action litigation. Plaintiffs have no interests antagonistic to those of other members of the Class. Plaintiffs are committed to the vigorous prosecution of this action and anticipates no difficulty in the management of this litigation as a class action.

109.      A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

110.      Class action status in this ERISA action is warranted under Rule 23(b)(1)(B) because prosecution of separate actions by the members of the Class would create a risk of

- 35 -

adjudications with respect to individual members of the Class which would, as a practical matter, be dispositive of the interests of the other members not parties to the actions, or substantially impair or impede their ability to protect their interests.

111.    Class action status is also warranted under Rule 23(b)(1)(A) because prosecution of separate actions by the members of the Class would create a risk of establishing incompatible standards of conduct for Defendant.

112.    Class action status in this action is warranted under Rule 23(b)(2) because Defendant has acted or refused to act on grounds generally applicable to the Class, thereby making appropriate final injunctive, declaratory, or other appropriate equitable relief with respect to each Class as a whole.

113.    Class action status in this action is warranted under Rule 23(b)(3) because questions of law or fact common to members of the Class predominate over any questions affecting only individual members, and class action treatment is superior to the other available methods for the fair and efficient adjudication of this controversy. Joinder of all members of the Class is impracticable.

114.    Plaintiffs reserve the right to invoke any provision of Rule 23 appropriate at the time Plaintiffs move to certify the class or otherwise address class certification issues.

## THE STATUTE OF LIMITATIONS SHOULD BE TOLLED

115.    Plaintiffs and the Class are entitled to the tolling of ERISA's statute of limitations due to fraud or concealment.

116.    By its deceptive nature, Defendant's Overcharge and Clawback Scheme has hidden Defendant's unlawful conduct from injured parties.

117.    Neither Plaintiffs nor Class members knew of the Overcharge and Clawback Scheme, nor could they have reasonably discovered the existence of the Overcharge and Clawback Scheme, until shortly before filing this action.

118.    Until discovered by Plaintiffs, Defendant's Overcharge and Clawback Scheme, and its unlawful conduct was hidden from Plaintiffs and the Class.

119.    To the extent that any of the causes of action alleged herein are subject to a specific statute of limitations, Defendant's fraud or concealment alleged herein tolls those requirements, for a specific amount of time to be determined as the litigation progresses.

120.    Further, ERISA's statute of limitations for fiduciary breach claims, ERISA § 413, 29 U.S.C. § 1113, provides that "in the case of fraud or concealment, [an] action may be commenced not later than six years after the date of discovery of such breach or violation."

121.    The Overcharge and Clawback Scheme — by its nature a secret endeavor by Defendant — remains hidden from most members of the Class. Moreover, during most of the Class Period, as defined above, each Defendant actively and effectively concealed its participation in the Overcharge and Clawback Scheme from Plaintiffs and other members of the Class through "gag clauses" and secrecy policies. In late 2018, Congressed outlawed such pernicious "gag clauses" when it enacted the Patient Right to Know Drug Prices Act.  Public Law No: 115-263. There is no question that Plaintiffs' claims are timely.

## COUNTS

### Count I

### For Violations of ERISA § 502(a)(1)(B), 29 U.S.C. § 1132(a)(1)(B)

122.    Plaintiffs incorporate by reference each and every allegation above as if set forth fully herein.

- 37 -

123.    ERISA § 502(a)(1)(B), 29 U.S.C. § 1132(a)(1)(B), provides that a participant or beneficiary may bring an action to enforce rights under the terms of the plan or to clarify her rights to future benefits under the terms of the plan.

124.    As set forth above, as a result of being overcharged for prescription drugs, Plaintiffs and the Class have been and likely will continue to be denied their rights under the Plans to be charged a lower amount for their prescriptions.

125.    Plaintiffs and the Class have been damaged in the amount of the Overcharges, including Spread. Plaintiffs and the Class are entitled to recover the amounts they have been overcharged.

126.    Plaintiffs and the Class are entitled to enforce their rights under the terms of the plans and seek clarification of their future rights and are entitled to an order providing, among other things:

(a)    That they have been overcharged;

(b)    For a declaration that they have a right under the ERISA Plans to pay no more for prescription drugs than the Plans specify;

(c)    For a readjudication of claims;

(d)    For an accounting and calculation of Defendant's profits from the Overcharge scheme;

(e)    For payment of all amounts due to them in accordance with their rights under the ERISA Plans; and

(f)    For an order enjoining future Overcharges and Clawbacks or any other additional amounts that conflict with their rights under the ERISA Plans.

## Count II

### ERISA § 502(a)(3), 29 U.S.C. § 1132(a)(3)
### for Violations of ERISA § 406(a)(1)(C) & (D), 29 U.S.C. § 1106(a)(1)(C) & (D)

127.     Plaintiffs incorporate by reference each and every allegation above as if set forth fully herein.

128.     ERISA § 406(a)(1)(C), 29 U.S.C. § 1106(a)(1)(C), provides that a fiduciary shall not cause a plan to engage in a transaction if it knows or should know that the transaction constitutes the payment of direct or indirect compensation in the furnishing of services by a party in interest to a plan.

129.     ERISA § 406(a)(1)(D), 29 U.S.C. § 1106(a)(1)(D), provides that a fiduciary shall not cause a plan to engage in a transaction if it knows or should know that the transaction constitutes the transfer to, or use by or for the benefit of a party in interest, of any assets of the plan.

130.     As alleged above, Defendant is a fiduciary of the ERISA Plans of the participants and beneficiaries in the Class. Defendant is also party in interest under ERISA in that it is a fiduciary and/or it provided prescription drug insurance and/or administrative "services" to Class members pursuant to the ERISA Plans. ERISA § 3(14)(A) & (B), 29 U.S.C. § 1002(14)(A) & (B). Thus it was engaged on one or both sides of these § 406(a) prohibited transactions.

131.     As a party in interest, Defendant received direct and indirect compensation in the form of undisclosed compensation, including Clawbacks, in exchange for the services it provided to Plaintiffs and the Class pursuant to their prescription drug Plans. ERISA § 406(a)(1)(C), 29 U.S.C. § 1106(a)(1)(C).

132.     Such transactions are strictly prohibited unless three requirements are met: (1) the services are necessary for the operation of a plan, (2) the services are furnished under a contract or arrangement that is reasonable; and (3) the compensation was reasonable. ERISA § 408(b)(2), 29 U.S.C. § 1108(b)(2).

133.     While the burden is on Defendant to invoke and establish this exception, the compensation paid to each Defendant pursuant to each prohibited transaction was not reasonable under ERISA § 408(b)(2), 29 U.S.C. § 1108(b)(2), in that the compensation was excessive and/or unreasonable in relation to the value of the services provided. Defendant's compensation was also unreasonable because it exceeded the premiums and other fees that were agreed upon for fully providing prescription drug benefits. Further, Defendant as a fiduciary of the ERISA Plans are entitled to receive at most reimbursement for their direct expenses. Moreover, the contract or arrangement was unreasonable because the Defendant failed to disclose Overcharge/Spread/

Clawback compensation pursuant to DOL Rule 408b-2(c).

134.     Defendant also received transfers of plan assets in that it received Plan and employer payments under coinsurance Plans through Clawbacks. ERISA § 406(a)(1)(D), 29 U.S.C. § 1106(a)(1)(D).

135.     In addition, Defendant used — and misused — assets of the ERISA Plans by leveraging the contracts underpinning these ERISA Plans to gain access to patients who needed prescription drugs and would be required to pay copayments, coinsurance, or deductible payments which Defendant could appropriate in its Overcharge and Clawback Scheme. Further, Defendant used — and misused — for its own benefit and the benefit of other parties in interest additional assets of the ERISA Plans — the contracts underpinning the ERISA Plans of members

- 40 -

of the Class — to effectuate its Overcharge and Clawback Scheme. ERISA § 406(a)(1)(D), 29 U.S.C. § 1106(a)(1)(D).

136.    Plaintiffs and the Class have suffered losses and/or damages and/or Defendant have been unjustly enriched in the amount of the Overcharges and Clawbacks Defendant took for themselves.

137.    ERISA § 502(a)(3), 29 U.S.C. § 1132(a)(3), authorizes a participant or beneficiary to bring a civil action: "(A) to enjoin any act or practice which violates any provision of this title or the terms of the plan, or (B) to obtain other appropriate equitable relief (i) to redress such violations or (ii) to enforce any provisions of this title or the terms of the plan."

138.    Pursuant to ERISA § 502(a)(3), 29 U.S.C. § 1132(a)(3), the Court should order equitable relief to Plaintiffs and the Class, including but not limited to:

(a)    an accounting;

(b)    a surcharge;

(c)    correction of the transactions and readjudication of claims;

(d)    disgorgement of profits;

(e)    an equitable lien;

(f)    a constructive trust;

(g)    restitution;

(h)    full disclosure of the foregoing acts and practices;

(i)    an injunction against further violations; and/or

(j)    any other remedy the Court deems proper.

**Count III**

**ERISA § 502(a)(3), 29 U.S.C. § 1132(a)(3)**
**for Violations of ERISA § 406(b)(1),(3), 29 U.S.C. § 1106(b)(1),(3)**

- 41 -

139.    Plaintiffs incorporate by reference each and every allegation above as if set forth fully herein.

140.    ERISA § 406(b), 29 U.S.C. § 1106(b), provides that a fiduciary shall not (1) deal with plan assets in its own interest or for its own account, (2) act in any transaction involving the plan on behalf of a party whose interests are adverse to the interests of participants or beneficiaries, or (3) receive any consideration for its own personal account from any party dealing with such plan in connection with a transaction involving the assets of the plan.

141.    As alleged above, Defendant is a fiduciary to the ERISA Plans. It violated all three subsections of ERISA § 406(b).

142.    As alleged above, (1) cost-sharing payments by Plans and employers or trusts under coinsurance Plans, (2) the contracts underpinning the Class members' ERISA Plans, and (3) Plan contributions are plan assets under ERISA.

143.    First, (1) by setting its own compensation from Plan and employer cost-sharing payments and taking its own compensation from that same source, and (2) by using Plan contracts in its own interest or for its own account to effectuate the Overcharge and Clawback scheme, Defendant violated ERISA § 406(b)(1). As to the latter, Defendant acted in its own self interest in using its authority over prescription drug benefit management and administration derived from the insurance policies, ASO contracts, and PBM agreements to design and implement the Overcharge and Clawback scheme for its own benefit.

144.    Second, by acting on behalf of itself and its affiliates, to profit from Overcharges and Clawbacks at the expense of Plaintiffs and members of the Class — and thus acting with parties with interests adverse to the affected participants and beneficiaries — Defendant engaged in a conflicted transactions each time it took Clawbacks in violation of

ERISA § 406(b)(2). Under this subsection of ERISA § 406(b), plan assets need not be involved — dealing with a plan is enough.

145.    Third, through its Overcharge and Clawback Scheme, Defendant violated ERISA § 406(b)(3) because it received consideration for its own personal accounts from other parties — including each other, pharmacies, Plans, employers, trusts, and the members of the Class — that were dealing with the ERISA Plans in connection with a transaction (a prescription drug transaction) involving the assets of the ERISA Plans.

146.    Plaintiffs and the Class have been damaged and suffered losses in the amount of the Overcharges and Clawbacks Defendant took through these prohibited transactions.

147.    ERISA § 502(a)(3), 29 U.S.C. § 1132(a)(3), authorizes a participant or beneficiary to bring a civil action: "(A) to enjoin any act or practice which violates any provision of this title or the terms of the plan, or (B) to obtain other appropriate equitable relief (i) to redress such violations or (ii) to enforce any provisions of this title or the terms of the plan."

148.    Pursuant to ERISA § 502(a)(3), 29 U.S.C. § 1132(a)(3), the Court should order equitable relief to Plaintiffs and the Class, including but not limited to:

(a)    an accounting;

(b)    a surcharge;

(c)    correction of the transactions and readjudication of claims;

(d)    disgorgement of profits;

(e)    an equitable lien;

(f)    a constructive trust;

(g)    restitution;

(h)    full disclosure of the foregoing acts and practices;

(i)     an injunction against further violations; and/or

(j)     any other remedy the Court deems proper.

### Count IV

### ERISA § 502(a)(2) and (3), 29 U.S.C. § 1132(a)(2) and (3) for Violations of ERISA §§ 404, 29 U.S.C. § 1104

149.     Plaintiffs incorporate by reference each and every allegation above as if set forth fully herein.

150.     ERISA § 404(a)(1), 29 U.S.C. § 1104(a)(1), provides that a fiduciary shall discharge its duties with respect to a plan in accordance with the documents and instruments governing the plan.

151.     Defendant failed to discharge its duties in accordance with the documents and instruments governing the ERISA Plans by requiring pharmacies to charge participants and beneficiaries cost-sharing payments that exceeded the limits imposed by the ERISA Plans, as alleged above.

152.     ERISA § 404(a)(1), 29 U.S.C. § 1104(a)(1), further provides that a fiduciary shall discharge its duties with respect to a plan (1) solely in the interest of the participants and beneficiaries and for the exclusive purpose of providing benefits to participants and beneficiaries and defraying reasonable expenses of administering the plan ("loyalty") and (2) with the care, skill, prudence and diligence under the circumstances then prevailing that a prudent person acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims ("prudence").

153.     In setting the amount of and charging Overcharges and taking Clawbacks, Defendant has breached its fiduciary duties of loyalty and prudence and have violated the terms of the Plans.

- 44 -

154.     Specifically, Defendant acted in furtherance of its own interests and the interests of its affiliates, and thus failed to act solely in the interests of participants and beneficiaries of the ERISA Plans, by requiring pharmacies to charge Overcharges and to remit Clawbacks.

155.     Defendant failed to act with the exclusive purpose of defraying reasonable expenses of administering the ERISA Plans by using its fiduciary control and discretion to require pharmacies collect Overcharges from participants and beneficiaries.

156.     Defendant failed to act with the care, skill, prudence, and diligence that a prudent PBM, insurer, and/or plan administrator would have used in similar circumstances by operating its Overcharge and Clawback scheme.

157.     The duties of loyalty and prudence also entail: (1) a negative duty not to misinform; (2) an affirmative duty to inform when the fiduciary knows or should know that silence might be harmful; and (3) a duty to convey complete and accurate information material to the circumstances of participants and beneficiaries.

158.     Defendant breached the duty to inform by (1) misrepresenting to participants and beneficiaries the proper cost-sharing amounts in both the Plan terms and when participants and beneficiaries filled their prescriptions and were charged by pharmacies; (2) failing to disclose to participants and beneficiaries the proper cost-sharing amounts, the manner in which it charged for prescription drugs, and the fact that the actual practices of charging and collecting cost-sharing payments for prescription drugs differ from the Plan terms; and (3) prohibiting pharmacies from disclosing to participants and beneficiaries the existence or amount of the Overcharges, Spread, and Clawbacks and the fact that participants and beneficiaries could purchase drugs at a price lower than the amount set by Defendant.

159.    In addition, a fiduciary that appoints another person to fulfill all or part of its duties, by formal or informal hiring, subcontracting, or delegation, assumes the duty to monitor that appointee to protect the interests of the ERISA participants and beneficiaries. As noted herein, the power to appoint, retain, and remove plan fiduciaries or service providers confers fiduciary status upon the person holding such power.

160.    Finally, it is never prudent to require or allow excessive compensation in the context of an ERISA-covered plan. In so doing, Defendant violated its duty of prudence.

161.    Plaintiffs and the Class have been damaged and suffered losses in the amount of their cost-sharing payments that exceeded the limits under the ERISA Plans or otherwise were excessive and unreasonable, including the amount of Spread that was Clawed Back by Defendant.

162.    ERISA § 409, 29 U.S.C. § 1109, provides, *inter alia*, that any person who is a fiduciary with respect to a plan and who breaches any of the responsibilities, obligations, or duties imposed on fiduciaries by ERISA shall be personally liable to make good to the plan any losses to the plan resulting from each such breach and to restore to the plan any profits the fiduciary made through use of the plan's assets. ERISA § 409 further provides that such fiduciaries are subject to such other equitable or remedial relief as a court may deem appropriate.

163.    ERISA § 502(a)(2), 29 U.S.C. § 1132(a)(2), permits a plan participant, beneficiary, or fiduciary to bring a suit for relief under ERISA § 409.

164.    ERISA § 502(a)(3), 29 U.S.C. § 1132(a)(3), authorizes a participant or beneficiary to bring a civil action: "(A) to enjoin any act or practice which violates any provision of this title or the terms of the plan, or (B) to obtain other appropriate equitable relief (i) to redress such violations or (ii) to enforce any provisions of this title or the terms of the plan."

- 46 -

165.    Pursuant to ERISA § 502(a)(3), 29 U.S.C. § 1132(a)(3), the Court should order equitable relief to Plaintiffs and the Class, including but not limited to:

(a)    an accounting;

(b)    a surcharge;

(c)    correction of the transactions and readjudication of claims;

(d)    disgorgement of profits;

(e)    an equitable lien;

(f)    a constructive trust;

(g)    restitution;

(h)    full disclosure of the foregoing acts and practices;

(i)    an injunction against further violations; and/or

(j)    any other remedy the Court deems proper.


\*    \*    \*    \*

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs, individually and on behalf of the Class, pray for relief as follows as applicable for the particular claim:

A.    Certifying this action as a class action and appointing Plaintiffs and the counsel listed below to represent the Class;

B.    Finding that Defendant is a fiduciary and/or a party in interest as defined by ERISA;

C.    Finding that Defendant violated its fiduciary duties of loyalty and prudence to Class members and awarding Plaintiffs and the Class such relief as the Court deems proper;

D.    Finding that Defendant engaged in prohibited transactions and awarding Plaintiffs

and the Class such relief as the Court deems proper;

E.    Finding that Defendant denied Plaintiffs and the Class benefits and their rights under the policies and awarding such relief as the Court deems proper;

F.    Enjoining Defendant from further such violations;

G.    Finding that Plaintiffs and the Class are entitled to clarification of their rights under the ERISA Plans and awarding such relief as the Court deems proper;

H.    Awarding Plaintiffs and the Class damages, surcharge, and/or other monetary compensation as deemed appropriate by the Court;

I.    Ordering Defendant to restore all losses to Plaintiffs and the Class and disgorge unjust profits and/or other assets of the ERISA Plans;

J.    Adopting the measure of losses and disgorgement of unjust profits most advantageous to Plaintiffs and the Class to restore Plaintiffs' losses, remedy Defendant's windfalls, and put Plaintiffs in the position that they would have been in if the fiduciary of the ERISA Plans had not breached its duties or engaged or permitted prohibited transactions;

K.    Ordering other such remedial relief as may be appropriate under ERISA, including the permanent removal of Defendant from any positions of trust with respect to the ERISA Plans of the members of the Class and the appointment of independent fiduciaries to serve in the roles Defendant occupied with respect to the ERISA Plans of the Class, including as pharmacy benefit administrators and managers;

L.    Awarding Plaintiffs and the Class equitable relief to the extent permitted by the above claims;

M.    Awarding Plaintiffs' counsel attorneys' fees, litigation expenses, expert witness fees and other costs pursuant to ERISA § 502(g)(1), 29 U.S.C. 1132(g)(1), and/or the common

fund doctrine;

N.    Awarding Plaintiffs and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

O.    Awarding such other and further relief as may be just and proper, including pre-judgment and post-judgment interest on the above amounts.

Dated: March 28, 2019                          Respectfully submitted,

                                               */s/ Matthew D. Camm*
                                               Matthew D. Camm (LA Bar # 35692)
                                               MOTLEY RICE LLC
                                               940 Gravier Street
                                               New Orleans, La 70112
                                               504-648-1480
                                               504-648-1499 fax
                                               mcamm@motleyrice.com
                                               *Lead Attorney*

                                               William H. Narwold
                                               Mathew Jasinski
                                               MOTLEY RICE LLC
                                               One Corporate Center
                                               20 Church Street, 17th Floor
                                               Hartford, CT 06103
                                               860-882-1681
                                               860-882-1682 fax
                                               bnarwold@motleyrice.com
                                               mjasinski@motleyrice.com

                                               Robert A. Izard
                                               Craig A. Raabe
                                               Christopher M. Barrett
                                               IZARD, KINDALL & RAABE, LLP
                                               29 South Main Street, Suite 305
                                               West Hartford, CT 06107
                                               860-493-6292
                                               860-493-6290 fax
                                               rizard@ikrlaw.com
                                               craabe@ikrlaw.com
                                               cbarrett@ikrlaw.com

Ronen Sarraf
Joseph Gentile
SARRAF GENTILE LLP
10 Bond Street, Suite 212
Great Neck, NY 11021
516-699-8890
516-699-8968 fax
ronen@sarrafgentile.com
joseph@sarrafgentile.com

**Attorneys for Plaintiffs**